Filed 1/3/24  P. v. Atayde CA6
Modification after recall of remittitur on 1/3/24

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>LUIS ANTONIO ATAYDE,<br><br>　　Defendant and Appellant. | H050104<br>(Monterey County<br>Super. Ct. No. 19CR010126)<br><br>ORDER MODIFYING OPINION,<br>NO CHANGE IN JUDGMENT |

BY THE COURT:

It is ordered that the opinion filed herein on October 6, 2023, be modified as follows:

On page 18, footnote 9 shall now read:

"The trial court referred to the mitigating factors as falling under section 1385, subdivision (c)(3), which was the original version of subdivision (c) as enacted pursuant to Senate Bill 81.  Section 1385 was amended effective June 30, 2022, and these factors are now listed under subdivision (c)(2).  (Stats. 2022 ch. 58 § 15.)  For consistency, we refer to the factors under the current version of the statute."

There is no change in the judgment.  The remittitur shall issue forthwith.

_____

Wilson, J.

_____

Bamattre-Manoukian, Acting P.J.

_____

Danner, J.

People v. Atayde
H050104

Filed 10/6/23  P. v. Atayde CA6 (unmodified opinion)
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>LUIS ANTONIO ATAYDE,<br><br>    Defendant and Appellant. | H050104<br>(Monterey County<br>Super. Ct. No. 19CR010126) |

In 2022, defendant Luis Antonio Atayde was found guilty of one count of first degree murder and one count of street terrorism.  Various sentence enhancement allegations, including a gang enhancement and firearm enhancement were also found true.  The court sentenced Atayde to 25 years to life for the murder conviction consecutive to an additional term of 25 years to life for the firearm enhancement.

On appeal, Atayde argues that there was insufficient evidence to support his conviction for street terrorism and the gang enhancement based on the recent legislative changes to Penal Code section 186.22. [1]  Atayde also claims that the trial court abused its discretion in denying his request to strike the firearm enhancement.  Finally, Atayde claims that he received ineffective assistance from counsel due to his trial counsel's failure to request that certain restitution fines and fees be stayed based on his inability to pay.

---

[1] Undesignated statutory references are to the Penal Code.

For the reasons explained below, we find no merit to Atayde's contentions and affirm the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Charges*, *Bench Trials*, *and Sentencing*

On December 13, 2021, the Monterey County District Attorney's Office filed a first amended information charging Atayde with the murder of John Joseph Rodzach (§ 187, subd. (a); count 1); shooting at an occupied vehicle (§ 246; count 2); and street terrorism (§ 186.22, subd. (a); count 3). For counts 1 and 2, the information also alleged that Atayde committed the charged offenses for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)) (gang enhancement) and he personally and intentionally discharged a firearm, a handgun, which caused great bodily injury and death to Rodzach (§ 12022.53, subds. (b)-(e)).

On December 8, 2021, Atayde waived his right to jury trial. The court also bifurcated the enhancements and the street terrorism charge in count 3 to be tried separately.

On March 25, 2022, after the prosecution finished presenting its case-in-chief, they dismissed count 2 and its included enhancements in the interest of justice. The trial court subsequently found Atayde guilty of first degree murder (count 1).

On March 28, 2022, the trial court held a bifurcated trial on count 3 and the enhancement allegations to count 1. At the conclusion, the trial court found Atayde guilty of street terrorism (count 3) and found true the gang enhancement and firearm enhancement in the commission of count 1.

On May 25, 2022, the trial court sentenced Atayde to 25 years to life in state prison for murder (count 1). The trial court denied Atayde's motion to strike the firearm enhancement and imposed a consecutive term of 25 years to life for the firearm enhancement. The court additionally imposed the middle term of 2 years for street terrorism (count 3), which was stayed pursuant to section 654.

2

Atayde timely appealed.

## B. Factual Background

### 1. Murder Trial

#### a. Murder of John Rodzach (count 1)

On February 11, 2017, F.H.[2] was with his friend, John Rodzach, at the Hebbron Heights Community Center in Salinas. While they were sitting on a planter box smoking, a green Honda Accord passed by, followed by a "whitish" or cream SUV. As the cars drove by, Rodzach stuck his chest out and made a motion with his arms as though he were saying " '[w]hat's up' " in a challenging manner. F.H. indicated that Rodzach had previously told him he was a gang member. After the cars passed Rodzach and F.H., the Honda Accord began turning back around, while the SUV continued on towards the park. The SUV then reversed, making a squealing noise with its tires, and came back towards Rodzach and F.H. The occupants then began shooting at them from the passenger's side of the car, resulting in Rodzach being shot.

Salinas Police Department Officer Cameron Mitchell responded to the Hebbron Heights Community Center after being notified of shots fired in the area. Upon his arrival, he found Rodzach lying in a pool of blood on the sidewalk near the community center. Rodzach was nonresponsive and later pronounced dead on scene.

Salinas Police Department Sergeant Rodolfo Roman also responded to the scene, where he observed Rodzach's body and recognized him from previous encounters. Roman stated that Rodzach was an "older, well-known" member of the Sureño gang and regularly hung out in the subject area. Roman also obtained and reviewed surveillance footage from a nearby car lot, which showed three vehicles following one another and driving in what Roman described as an "odd" direction. The video footage showed that the first car was a gray sedan, the second car was a 2013 white Lexus SUV, and the third

---

[2] We refer to the witnesses in the proceedings by their initials only to protect their personal privacy interests pursuant to California Rules of Court, rule 8.90(b)(10), (11).

card was a dark-colored Honda.  Roman additionally located vehicle debris on the scene, which was later identified as part of the grille from the Lexis SUV.

Salinas Police Department Officer Michael Rivera, a crime scene investigator, collected a number of cartridge shell casings from the scene, including ten .22 caliber casings and eight .40 caliber casings.

### b.  Testimony of Fellow Gang Members[3]

BG4[4], who testified for the prosecution in exchange for a plea bargain, stated that he had been a member of the Boronda subset of the Norteño gang between 2016 and 2019.  BG4 indicated that in 2017, Shocky Tavale (Shocky) was his "big homie" who gave him orders on what rival gang members to shoot and "brought [him] up" by certifying him into the gang.  BG4 noted that Shocky would often point out people that he believed were rival gang members and trained BG4 in following them through traffic to their homes.  Shocky also provided many gang members, including BG4, with guns.  Shocky killed and arranged for the killing of various people.  He instructed BG4 and other gang members to shoot someone five times in the chest or head, then "empty out the clip" into their head once they dropped.

As a member of either the Borondas or Santa Rita Bahamas, there was an expectation to "hunt," which BG4 defined as looking for rival gang members, specifically Sureños, to kill.  BG4 confirmed that he had helped fellow Norteños kill people and had killed people himself.  BG4 also confirmed that he knew Atayde, also known as Reeses, and had worked with him on committing crimes in the past.

---

[3] While the trial court bifurcated the gang enhancement and street terrorism charge, it granted the prosecution's motion in limine to introduce certain gang evidence during the murder trial under Evidence Code section 1101, subdivision (b), for the purposes of establishing motive, the premeditation and deliberation elements of the murder charge, and aiding and abetting and conspiracy to commit murder.

[4] This witness's name was redacted from the court record.

BG4 additionally spoke about the certification process into the gang, where a member was "embraced" into the gang fully by doing "what it [takes]" to get into the neighborhood, such as killing a rival gang member. BG4 indicated that a member had to be certified in order to obtain a gang tattoo, including one particular to the "hood" that the member belonged to (such as Borondas or Santa Rita Bahamas). BG4 confirmed that he was certified into the Boronda subset and received the associated hood tattoo in 2017 following an attempted murder where he personally shot someone.

BG4 testified that on the night of February 11, 2017, he received a text from Shocky asking if he wanted to go "hunting" that night. BG4 then met Shocky, Atayde, and gang members Bandit, Andrew Alvarado (also known as Oso), and Neil Aguillon (Neil) at Shocky's apartment, where they decided that Atayde should be the shooter as he was not yet certified. BG4 decided to be a shooter with Atayde, while Neil was assigned as the driver. They then proceeded to the Hebbron area in three cars: Alvarado in a green Honda Accord; Atayde, BG4, and Neil in a white Lexus SUV; and Bandit and Shocky in a silver Mitsubishi. BG4 indicated that in this set up, the middle car was the shooter car, while the front and back cars acted as "security cars" to make sure shooters get away and did not get caught by the police.

BG4 testified that the members of each vehicle communicated with each other via a three-way phone call in order to point out targets and alert the others of any police in the area. During the call, BG4 was alerted that there was a southerner in the area, and the members discussed how to kill him. Armed with guns, BG4 had a .40 caliber Springfield Armory XD, while Atayde had a .22 caliber Beretta Neos. Neil subsequently pulled up to the curb at the Hebbron Heights Community Center, while BG4 and Atayde leaned out the front and rear passenger windows, respectively, and began shooting.

As they approached, BG4 observed a taller white man and a shorter Hispanic man in front of them. BG4 shot the taller man once, who dropped immediately to the ground while the shorter man began running. Atayde also began shooting and "the bodies

dropped to the ground." As the shorter man ran away, both Atayde and BG4 continued firing, with BG4 emptying his clip into the body on the ground. Atayde, BG4, and the other gang members then returned to Shocky's house, where they gave their guns back to Shocky. At the time, they noticed that while the .40 caliber gun was empty, the .22 caliber gun still had a few bullets remaining. BG4 and Alvarado then certified Atayde because he had helped kill somebody, and Atayde received an SRB (Santa Rita Bahamas) tattoo on his chest as a result.

BG3[5], who also testified in exchange for a plea bargain, stated that he was a member of the Boronda subset of the Norteño gang in 2017 and had associated with members of the Santa Rita Bahamas subset. BG3 knew Atayde "from the streets" and had been locked up with him at the youth center for a period of time. BG3 confirmed that on February 11, 2017, he met up with Shocky, BG4, Atayde, and Neil at Shocky's apartment, where Shocky strategized on how to go "hunting" in order to get Atayde certified. Shocky also provided .40 caliber and .22 caliber guns. BG3 accompanied them to the Hebbron Heights area as a passenger in Shocky's car, which he identified as the security car. Shocky's car was in front, the white Lexus - driven by Neil with BG4 and Atayde as passengers - was in the middle, and Alvarado, who joined up with the group later, drove the last car. Similar to BG4's testimony, BG3 indicated that this was a usual set-up for "hunting" with the middle car being the shooter car, while the front and back cars were security to watch for police, identify potential targets, and block the shooter car from being pulled over. BG3 also confirmed that the parties used a three-way call to communicate between the various vehicles.

BG3 stated that when the cars passed the Hebbron Heights Community Center, either Shocky or someone on the call indicated there was someone with a bald head standing outside. In response, another person on the call said " 'Fuck it. Like , shoot

---

[5] This witness's name was redacted from the court record.

him.' " BG3 and Shocky then made a U-turn and drove back towards the community center when BG3 heard gunshots. BG3 noted that BG4 used the .40 caliber gun, while Atayde used the .22 caliber gun.

After the shooting, BG3 spoke with Atayde, who said he focused on the same person that BG4 was shooting instead of trying to shoot the person running away. BG3 confirmed that Atayde was certified following the shooting and subsequently received the "SRB" tattoo on his chest.

G.C., a former Norteño gang member who had dropped out of the gang by the time of trial and testified in exchange for a plea agreement, testified that he had previously been an "overseer" in the "D" pod of the Monterey County Jail. G.C. indicated that this role often involved other prisoners voluntarily confessing their crimes to him in an attempt to be recruited as members of the Norteño prison gang, known as "Norteño soldados." G.C. stated that Atayde, known as "Reeses", was also housed in the "D" pod of the jail and had a number of conversations with him while in jail. Atayde told G.C. that he had murdered a "south-sider" from Hebbron Street in 2017. He told G.C. that during the murder, he was Face Timing with another gang member, Shocky, who was in the vehicle in front of him. After Atayde showed Shocky the people in the surrounding area through his phone screen, he asked Shocky if he should " 'hit [Rodzach] up[,]' " to which Shocky responded " 'go ahead.' " Atayde then "hit up" Rodzach, who "threw up three," and Atayde proceeded to kill him. Atayde indicated that after this murder, he was certified as a member of the Santa Rita Bahamas, a subset of the Norteño gang, and was permitted to get an "SRB" tattoo on his chest. After Atayde told G.C. he had murdered Rodzach, G.C. gave Atayde permission to obtain a "2000 Blok" tattoo on his leg. This approval signified that Atayde was "look[ing] good" in the eyes of Norteño authority figures.

### c. Uncharged Attempted Murder (Orchard Avenue Shooting)

BG4 testified that on February 12, 2017, Shocky contacted him again about "doing something." When he arrived at Shocky's apartment, Shocky and his cousins wanted to go shooting because Shocky was excited about the white Lexus SUV, which Neil had previously stolen. BG4 stated that Atayde volunteered to be a shooter with Shocky's cousins and went with them in the Lexus, which was assigned as the shooter vehicle with Neil as the driver. BG4 drove with Shocky in his car as the lead security vehicle. The cars proceeded to an area near Orchard Avenue in Salinas[6], where they saw a car backing up and preparing to park. Neil parked directly in front of this car. Shocky's cousins exited the Lexus and began shooting at the targeted car. The targeted car accelerated away, hitting the Lexus in the process. After Neil, Atayde, and Shocky's cousins emptied out their clips "for the most part," they ran down the street and jumped into the lead security car. The Lexus was left at the scene.

Salinas Police Department Officers Anthony Yates, who responded to the scene, collected multiple .40 caliber, .380 caliber, and .22 caliber casings. Officer Rivera, who also responded to the scene, subsequently located and collected two more casings, a .22 caliber casing and a .40 caliber casing, after the Lexus was removed from the scene.

### d. Further Homicide Investigation

Salinas Police Department Officer Brian Gansen testified that he was the lead detective in charge of an investigation titled " 'REDRUM.' " This investigation involved over 40 attempted homicides and homicides between the years 2016 and 2017 that were committed by Norteño gang members from the Boronda and Santa Rita Bahamas subsets. Gansen indicated that the homicides had overlapping evidence and suspects, and confirmed that Shocky Tavale and Andrew Alvarado were involved in a number of the homicides being investigated. Gansen also confirmed that BG4 was involved in more

---

[6] Although BG4 did not testify that Orchard Avenue was located in Salinas, the plea agreement he signed in exchange for his testimony provides this information.

than one of the homicides, and indicated he was very familiar with BG4 from interviewing and contacting him multiple times over the five years of the REDRUM investigation.

Gansen positively identified BG4 as the front seat passenger in the white Lexus SUV in the car lot surveillance footage. Gansen was also familiar with Shocky Tavale's vehicle, a gray Mitsubishi Gallant with a missing front passenger's side mirror, and identified this car as the lead vehicle from the surveillance footage. Lastly, Gansen positively identified Andrew Alvarado's vehicle, a green Honda Accord with aftermarket rims and tinting on the back passenger windows only, as the final vehicle of the three displayed in the surveillance footage.

Dr. Venus Azar, a forensic pathologist at the Monterey County Sheriff's Office, conducted Rodzach's autopsy. Dr. Azar observed five gunshot wounds on Rodzach's body in the following areas: (1) his head; (2) his back; (3) his buttocks; (4) his right arm; and (5) his left leg. Based on his examination of the wounds to Rodzach's head and back, Dr. Azar concluded that either of those wounds would have been fatal and determined Rodzach's cause of death to be multiple gunshot wounds.

Criminalist Rachel Frase from the California Department of Justice, Bureau of Forensic Services Crime Lab examined the cartridge casings collected from the Hebbron Heights Community Center and the Orchard Avenue shooting. Based on Frase's examination of the cartridge casings from Hebbron Heights, she concluded that it was highly likely all of the .22 casings were fired from the same gun. Additionally, in comparing the .22 casings from Hebbron Heights with the .22 casings from the Orchard Avenue shooting, Frase determined that it was highly likely that they were all fired from the same gun. Frase similarly concluded that it was highly likely that all of the .40 casings from Hebbron Heights were fired from the same gun. After comparing the .40 casings between the two scenes, Frase concluded that eight of the .40 casings from

9

Orchard Avenue were highly likely fired in the same gun as the .40 casings in Hebbron Heights.

## 2. Bifurcated Trial on Enhancements (to count 1) and Street Terrorism (count 3)

### a. Atayde's Gang Involvement

On September 26, 2017, Salinas Police Department Officer Luis Toribio observed a gray Honda sedan in the Salinas area with approximately four people inside. When Toribio pulled behind the car, it quickly accelerated away from him and turned onto another road, where three of the occupants jumped out before the car stopped. Atayde was sitting on the rear driver's side passenger seat. Atayde exited the car and began walking towards a nearby residence holding a balled-up sweatshirt, which appeared as if there was something wrapped up inside it. Atayde walked behind a van parked at the residence and then came back out without the sweatshirt. Toribio searched behind the van and found the sweatshirt, which contained a .380 chrome revolver loaded with live bullets. Toribio then spoke with Atayde, who confirmed he was a member of the Santa Rita Bahamas.

On October 10, 2021, while Atayde was in the Monterey County Jail, he and another inmate, Macias, attacked a third inmate, Orlando Perez, a Northside gang member who had lost his gang status. The incident was captured on a surveillance video and showed both Atayde and Macias attacking Perez, with Macias using a jailhouse shank. Detective Jesse Pinon of the Monterey County Sheriff's Office described the attack as a "removal," which involved the removal of a person in a housing area that is usually gang-related. Pinon confirmed that the removal took place in the "D" dorms, which housed active Norteño members, and that a removal was generally viewed as a good thing by the gang.

Monterey County Sheriff Deputy Michelle Bossuot, who worked in classification of inmates by assigning them housing, testified that Atayde had been regularly housed in

dorms and pods within the jail designated for active Norteño members. Bossuot noted that Atayde did not have any issues while residing in these dorms and was in good standing with the gang, and she believed Atayde was still an active gang member as of trial.

### b. Expert Gang Testimony

Salinas Police Department Officer Evan Adams testified as an expert in the investigation of gang-related crimes within Monterey County, specifically the Norteño gang. Adams testified that as of February 11, 2017 (the date of Rodzach's murder), the Norteño gang was a formal organization with the Nuestra Familia overarching prison gang at the top, followed by the Norteño criminal street gang and various subsets of the street gangs. The Norteño gang's primary rivals and enemies were the Sureño criminal street gang. As of February 2017, the Norteños' primary criminal activities consisted of manslaughter (section 192), homicide, carrying a concealed firearm (section 25400), assault with a deadly weapon (section 245), and possession of controlled substances for sale (Health & Saf. Code, § 11351.) Norteño members also collectively engaged in a pattern of criminal activity in 2017.

Adams noted that Norteños viewed specific neighborhoods as strongholds for the gang and believed it was their duty to protect those areas from rival drug dealers and gangs. They also viewed rival neighborhoods as areas where they needed to increase their influence and target occupants. Adams also confirmed that Hebbron Street in Salinas was considered a Sureño territory.

Adams believed that Atayde was an active member of the Norteño gang and specifically the Santa Rita Bahamas subset as of 2017 up until the time of trial. Adams' conclusion was based on the following factors: (1) various gang-related tattoos on Atayde's body; (2) photos of Atayde with other Norteño and Santa Rita Bahamas gang members, including photos where he displayed gang signs or his gang-related tattoos; (3) Atayde's involvement in an Instagram group message with several other documented

11

gang members where they openly discussed gang activity, such as certifications; and (4) Atayde's behavior while in custody, including his exclusive residence in a Norteño pod since his arrest in 2017, obtaining more gang-related tattoos while in custody, and participation in the removal in 2021.

Adams confirmed that Shocky Tavale, BG3, BG4, Andrew Alvarado, and Neil Aguillon were all active members of the Norteño street gang as of February 11, 2017. He noted that while they were members of different subsets of the Norteño gang, they routinely worked together for the benefit of the overarching gang. These collaborations between subsets took place both in custody and out on the streets.

When presented with a hypothetical question which tracked the facts of Rodzach's murder, Adams stated that murdering a rival gang member was the crime that most benefitted the Norteño street gang. Such a murder would eliminate a rival from the streets who the Norteño gang believed could potentially target or kill their members, instill fear in additional rival Sureño gang members, and allow the Norteño gang members to take over rival drug turf and sell more narcotics, thus making more money.

Adams also believed that the crimes mentioned in the hypothetical were committed at the direction of the criminal street gang. He noted that the crimes involved several gang members in multiple cars traveling with the sole purpose of murdering a rival gang member and regularly communicating amongst one another, with several "big homies" both directing and witnessing the crimes. Further, as certification requires multiple gang members with status to witness the crime, having several different members come out and direct a younger member to commit a crime would allow them to verify his certification into the gang. Adams additionally believed the crimes were committed in association with a street gang because of the level of collaboration and planning between the gang members in locating the victims, choosing shooters and watching out for police, as well as the common goal of removing a rival from the streets for the gang's benefit.

12

Finally, Adams opined that the crimes in question promoted, furthered, and assisted criminal conduct by gang members. Adams noted that the murder of a rival would typically appear on the news and therefore assist in recruitment of new members, particularly for subsets that want to portray themselves as killers or violent. In addition, removing a rival would continue the ongoing rivalry between Norteños and Sureños, eliminate an enemy from the streets, and lead to certification of additional members by allowing them to go out and commit additional crimes for the gang's benefit. Murdering a rival, and thereby removing others who might target them, would assist the gang by making certain areas safer for them and provide additional drug turf, particularly in neighborhoods known for selling narcotics.

### c. Predicate Offenses

Salinas Police Department Officer testified that on September 25, 2016, Dwayne Jefferson and Robert Campos, who were active Norteño gang members at the time, committed the offense of possession of heroin for sale (Health & Saf. Code, § 11351), and were subsequently convicted of that offense.

Investigator Benjamin Draeger of the Monterey County District Attorney's Office testified that on March 22, 2015, Hilario Urquizo and Juan Almaguer, who were active Norteño gang members at the time, committed the crime of carrying a concealed firearm (section 25400) and were subsequently convicted of that offense.

Detective Pinon testified that on April 14, 2014, Fernando Miranda and Johnny Magdaleno, who were active Norteño gang members at the time, committed the crimes of assault with a deadly weapon (section 245) and attempted murder and were subsequently convicted of both offenses.

Detective Gansen testified that on October 11, 2013, Elijah Hernandez and Jesse Flores, who were active Norteño gang members at the time, committed the crime of voluntary manslaughter (section 192, subdivision (a)) and were subsequently convicted of that offense.

In addition to the testimony above, the prosecution submitted certified records from the convictions into evidence with no objection from the defense.

## II.   DISCUSSION

### A.  *Sufficiency of Evidence for Gang Enhancement and Street Terrorism*

Atayde contends that there was insufficient evidence to support his conviction of street terrorism in count 3 and the court's true finding of the gang enhancement for count 1.  Atayde specifically argues that the prosecution failed to present any evidence during the bifurcated trial that met the new requirements of section 186.22, subdivision (e)(1) as amended by Assembly Bill 333.

For the reasons discussed below, we find there was substantial evidence to support the trial court's conviction for street terrorism and true finding of the gang enhancement under the newly amended requirements of section 186.22.

### 1.  *Legal Principles and Standard of Review*

In 2021, the Legislature passed Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333), which became effective on January 1, 2022 (Stats. 2021, ch. 699). Assembly Bill No. 333 redefined the elements of both the substantive offense of street terrorism under section 186.22, subdivision (a) and the section 186.22, subdivision (b) gang enhancement in several respects.  (*People v. Tran* (2022) 13 Cal.5th 1169, 1206 (*Tran*).)  One of those changes concerns the definition of  " 'pattern of criminal gang activity' " under subdivision (e).  Prior to the 2022 amendment, the last clause of the paragraph that is now subdivision (e)(1) only provided that the pattern offenses must be "offenses [that] were committed on separate occasions, or by two or more [persons]." (Former § 186.22, subd. (e)(1); Stats. 2017, ch. 561, § 178.)  The 2022 amendment expanded this requirement such that the pattern offenses must now be "offenses [that] were committed on separate occasions or by two or more members, the offenses commonly benefited a criminal street gang, and the common benefit from the offenses is more than reputational."  (§ 186.22, subd. (e)(1).)  The amendment further provided

14

examples of what would qualify as a non-reputational benefit, such as "financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant."  (§ 186.22, subd. (g).)

The California Supreme Court determined that " 'Assembly Bill 333 essentially add[ed] new elements to the substantive offense and enhancement[] – for example, by requiring proof. . . 'that the predicate and underlying offenses provided more than a reputational benefit to the gang . . . .' [Citations.]  These changes have the effect of 'increas[ing] the threshold for conviction of the section 186.22 offense and the imposition of the enhancement.' "  (*Tran, supra,* 13 Cal.5th at p. 1207.)

In determining whether the evidence is sufficient to support a conviction, we "review 'the whole record in the light most favorable to the judgment' and decide 'whether it discloses substantial evidence . . . such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'  [Citation.]  Under this standard, the court does not ' "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." [Citation.]  Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' "  (*People v. Hatch* (2000) 22 Cal.4th 260, 272.)  "We review the sufficiency of the evidence to support an enhancement using the same standard we apply to a conviction."  (*People v. Wilson* (2008) 44 Cal.4th 758, 806.)

## 2. *Substantial Evidence Supported the Trial Court's Conviction for Street Terrorism and the Gang Enhancement Under the Revised Requirements of Section 186.22*

Atayde claims that the prosecution failed to present any evidence during the bifurcated trial on count 3 and the gang enhancement that the predicate offenses benefitted the gang in a manner that was more than reputational.  Atayde notes that Adams only provided expert testimony regarding the benefit to the gang from the murder

15

of a rival gang member but did not testify about the predicate offenses or any common benefit achieved from them. Atayde similarly contends that the officers who testified regarding the predicate offenses also did not provide any testimony regarding the common benefit of these offenses to the gang.

In response, the Attorney General claims that the evidence presented in the bifurcated trial was not the only evidence offered regarding predicate offenses. Specifically, the Attorney General asserts that evidence of four other predicate offenses, namely, a double murder and a double attempted murder (one case), and three other attempted murders, involving BG3 and BG4 was presented in the murder trial. The Attorney General argues that BG3, BG4, and Adams all provided substantial testimony regarding how the crime of murder benefitted the gang in ways that were more than reputational, such as obtaining more drug turf and making more money from increased narcotic sales, eliminating rival gang members, and allowing for gang members to become certified following a murder. As all gang-related testimony from the murder trial was incorporated into the bifurcated trial pursuant to stipulation, the Attorney General contends that this evidence was sufficient to demonstrate a pattern of criminal activity that benefitted the gang in a manner that was more than reputational. The Attorney General further argues that because only two predicate offenses are required under section 186.22, subdivision (e), we need not consider whether the evidence of other crimes presented in the bifurcated trial constituted predicate offenses.

The record confirms that the parties stipulated that all evidence heard in the murder trial would be incorporated into the bifurcated trial on the enhancements and street terrorism charge. In addition, while the prosecution did not indicate on the record that the offenses discussed in the murder trial were being presented as predicate offenses in the bifurcated trial, the prosecution requested the court to consider the evidence submitted from the case-in-chief alongside all evidence presented at the bifurcated trial. Indeed, in making its final ruling, the court explicitly noted that it had considered the

16

evidence and testimony presented from both the murder trial and the bifurcated trial. Accordingly, viewing the evidence in the light most favorable to the prosecution, we agree that the testimony from BG3 and BG4 regarding the prior murders and attempted murders could be properly considered as predicate offenses establishing a pattern of criminal activity as defined by section 186.22, subdivision (e).[7]

Moreover, the description of the prior offenses by BG4 and BG3, as well as Adams' expert testimony regarding the various benefits of murder to the gang, all demonstrate that the benefit of these offenses was more than reputational. To explain, BG4 testified that the common process for becoming certified usually involved shooting a rival gang member, and confirmed that he became certified following an attempted murder on Towt Street in Salinas in December 2016.[8] BG3 also testified that in January 2017, he had gone "hunting" for rivals with two other Norteño members on Sunrise Street in Salinas, where they encountered what appeared to be a Sureño party and began shooting, resulting in four people being shot and two subsequent deaths. Both these offenses involved the elimination of a rival gang member, which was not only discussed by Adams in his expert testimony as a benefit to the gang but also enumerated in section

_____

[7] Atayde argues on reply that in order for these offenses to qualify as predicate offenses, the prosecution needed to introduce certified records of convictions in the same manner as they did for the other predicate offenses discussed in the bifurcated proceeding. We find this contention without merit. Section 186.22, subdivision (e)(1) specifically defines a " 'pattern of criminal activity' " as including the commission, attempted commission, or conviction of a crime. Accordingly, there is no requirement that the predicate offense result in a conviction. (See *In re I.M.* (2005) 125 Cal.App.4th 1195, 1207-1208 [evidence that a gang member was prosecuted for an offense, without a showing that he was convicted, was sufficient evidence of "commission" of predicate offense for pattern of criminal gang activity].) "Because section 186.22, subdivision (e) contains both the options of 'commission' or 'conviction,' the statute expressly does not require that the offense necessarily result in a conviction." (*People v. Garcia* (2014) 224 Cal.App.4th 519, 524.)

[8] BG4's plea agreement, which was submitted into evidence without objection, indicated that Towt Street was Shocky's "preferred hunting grounds" and the location of the shooting was a "known" Sureño house.

17

186.22, subdivision (g) as a non-reputational benefit. Accordingly, viewing the evidence in the light most favorable to the prosecution, we find that the testimony of BG4 and BG3 regarding their prior offenses, as well as the testimony of Adams regarding the non-reputational benefits of murder to a gang, provided substantial evidence to support the conviction of street terrorism and true finding on the gang enhancement under the new requirements of section 186.22.

## B. *Abuse of Discretion in Denial of Motion to Strike*

Atayde next argues that the trial court abused its discretion in denying his motion to strike the section 12022.53, subdivision (d) firearm enhancement. Atayde claims that section 1385, as recently amended by Senate Bill No. 81 (2021-2022 Reg. Sess.) (Senate Bill 81), encourages the trial court to dismiss enhancements in the furtherance of justice when various mitigating circumstances are present. Atayde argues that by refusing to strike the enhancement even after hearing evidence of four mitigating circumstances, the trial court abused its discretion.

### 1. *Background*

Prior to the sentencing hearing, Atayde filed a motion to strike the firearm enhancement. Atayde cited the following circumstances in mitigation: (1) his young age of 17 years old; (2) his limited criminal history; (3) his very little "if any" substantive gang history; (4) this case was his first criminal conviction; and (5) his educational background, in that he had completed high school and taken some college courses.

At the sentencing hearing, the trial court provided a detailed discussion regarding its evaluation of Atayde's motion to strike, including its consideration in "great weight" of the enumerated factors in section 1385, subdivision (c). The court appeared to acknowledge that pursuant to section 1385, subdivision (c)[(2)](C)[9] , the application of the firearm enhancement would result in Atayde being sentenced to a term of over 20

_____

[9] The trial court erroneously referred to the factors as falling under section 1385, subdivision (c)(3), even though the factors are all listed under subdivision (c)(2).

years. However, the court noted that because the principal crime had a mandatory term of 25 years to life, Atayde would have a sentence of over 20 years regardless of whether the court imposed an additional penalty for the enhancement.

The trial court next discussed section 1385, subdivision (c)[(2)](B), regarding multiple enhancements being alleged, but noted that this factor did not weigh in favor of dismissal because one of the enhancements (the gang enhancement) did not involve additional jail time.

Related to section 1385, subdivision (c)[2](E), the court stated that it had received information regarding Atayde's childhood trauma, resulting from his exposure to domestic violence and other adverse childhood experiences. However, the court felt that Atayde's trauma was not closely connected to the murder charges such that it required dismissal, a lesser enhancement, or reduction to a lesser penalty, particularly in light of the specific facts of the case and the services and opportunities Atayde was given on probation.

Finally, pursuant to section 1385, subdivision (c)[2](G), the court acknowledged that Atayde was under the age of 18 at the time of the murder and indicated it had given great weight to this factor. However, the court noted that Atayde continued to re-offend after committing the murder, including an attempted murder the very next day; had sustained juvenile petitions within months of the crime; violated juvenile probation; absconded from aftercare, quit school, and resumed drug use even after receiving a scholarship; and obtained new gang tattoos and participated in gang-related violence while in custody.

The court next considered whether dismissal of the enhancement or a lesser penalty would result in Atayde posing an unreasonable risk of danger to the public "measured by a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others." In making this determination, the court

19

indicated it had analyzed circumstances in mitigation and aggravation as laid out in California Rules of Court, rule 4.421.

The court cited numerous factors in aggravation, including "great violence, great bodily harm, and other acts disclosing a high degree of cruelty, viciousness, and callousness." This included the "glee" Atayde displayed in anticipating the opportunity to go hunting for people to kill, the sophisticated manner in which the murder was planned out and executed, the pride and lack of remorse he displayed when discussing the murder on social media, and the callous manner in which victims were targeted simply because they were assumed to be rival gang members. The court accordingly found that Atayde had engaged in violent conduct indicating a serious danger to society as provided in California Rules of Court, rule 4.421(b)(1). The court did note Atayde's lack of a criminal record as a mitigating circumstance, but ultimately concluded that it would not be in the interest of justice to dismiss the enhancement or impose an enhancement with a lesser penalty.

### 2. *Legal Principles and Applicable Law*

In general, we review a trial court's decision not to strike a sentence enhancement under section 1385 for abuse of discretion. (*People v. Carmony* (2004) 33.Cal.4th 367, 371 (*Carmony*); *People v. Mendoza* (2023) 88 Cal.App.5th 287, 298 (*Mendoza*).) The abuse of discretion standard is highly deferential. (*Mendoza, supra,* 88 Cal.App.5th at p. 298.) When, " ' "as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' " ' " (*Carmony*, *supra*, 33 Cal.4th at pp. 376–377.)

Senate Bill 81, effective January 1, 2022, added subdivision (c) to section 1385. Subdivision (c) provides, "[n]otwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that

enhancement is prohibited by any initiative statute." (§ 1385, subd. (c)(1).) [¶] "In exercising its discretion under [subdivision (c)], the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in [the subparagraphs to subdivision (c)(2)] are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety. 'Endanger public safety' means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others." (§ 1385, subd. (c)(2).) The mitigating circumstances identified in the subparagraphs include, among others: (1) "[m]ultiple enhancements are alleged in a single case. In this instance, all enhancements beyond a single enhancement shall be dismissed[;]" (2) [¶] "[t]he application of an enhancement could result in a sentence of over 20 years. In this instance, the enhancement shall be dismissed[;]" (3) [¶] "[t]he current offense is connected to prior victimization or childhood trauma[;]" and (4) [¶] "[t]he defendant was a juvenile when they committed the current offense[.]" (§ 1385, subd. (c)(2)(B), (C), (E) & (G).)

There currently exists a split of authority regarding the application of section 1385, subdivision (c). (See *People v. Walker* (2022) 86 Cal.App.5th 386, 302, review granted Mar. 22, 2023, S278309 (*Walker*) [holding that the term "great weight" and existence of mitigating circumstances creates a rebuttable presumption in favor of dismissal unless the court finds dismissal would endanger public safety]; but see also *People v. Ortiz* (2023) 87 Cal.App.5th 1087, review granted Apr. 12, 2023, S278894 (*Ortiz*) [holding that the existence of a statutory mitigating circumstances does not compel the court to dismiss the enhancement even if it does not explicitly find that a dismissal would endanger public safety].) How courts should construe and apply the newly added provision is a question currently pending before the California Supreme Court.

### 3. *Analysis*

Atayde argues that the trial court erred by not properly considering the circumstances enumerated in section 1385, subdivision (c)(2), in evaluating his motion to strike. For example, Atayde claims the trial court abused its discretion by failing to comply with the language in section 1385, subdivisions (c)(2)(B) and (C) stating that the enhancement "shall" be dismissed if the enumerated circumstances are present. Atayde argues that usage of the word "shall" indicated that dismissal of the enhancement was mandatory such that the trial court had no basis for choosing not to dismiss.

We disagree. California courts, including this one, have ruled that the "shall be dismissed" language should not be viewed in isolation, but in conjunction with the statute as a whole, and therefore concluded that such language does not mandate dismissal of the enhancement. (See *Ortiz, supra,* 87 Cal.App.5th at p. 1093 [holding that the specification of mandatory factors does not displace the court's obligation to exercise its discretion in determining whether dismissal is in the furtherance of justice]; *Mendoza, supra,* 88 Cal.App.5th at p. 296 [concluding that the "shall be dismissed" language, as well as the language of all of the listed mitigating circumstances, only applies if the court does not find that dismissal of the enhancement would endanger public safety]; *Walker, supra,* 86 Cal.App.5th at p. 396 [holding that the usage of the word "shall" does not wholly deprive the trial court of its discretion to dismiss an enhancement].) Accordingly, the trial court was not obligated to dismiss the enhancement simply because two mitigating circumstances containing the language "shall be dismissed" were present.

In addition, despite the previously discussed split in authority, the cases cited above have all held that it is within the court's discretion not to dismiss the enhancement if it makes a finding that dismissal would endanger public safety. (See *Ortiz, supra,* 87 Cal.App.5th at p. 1094; *Mendoza, supra,* 88 Cal.App.5th at p. 297; *Walker, supra,* 86 Cal.App.5th at p. 399-400.) As described above, the court spoke at length at the sentencing hearing about the various mitigating factors and why it did not believe they

22

weighed in favor of dismissal, and also as to why it believed dismissal would result in physical injury or danger to others. In discussing public safety, the court pointed to the violent nature of Atayde's crime, his callous attitude towards the victim and the murder, and the sophistication and detail involved in planning and executing the murder. In addition, while not specifically referenced in its discussion of public safety, the trial court also spoke about Atayde's continuing gang membership in jail and his commission of other violent offenses both the day after the murder and while in jail. Based on these factors, it was not an abuse of discretion for the trial court to conclude that dismissing the penalty and the associated increase in Atayde's sentence would result in physical injury or danger to others.

Atayde claims that the factors above do not demonstrate that his release would result in physical injury or serious danger to others, noting that under the murder charge alone, he would be in his forties at the earliest possible time of his release and less likely to reoffend. However, "section 1385, subdivision (c) does not require the trial court to consider any particular factors in determining whether 'there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others.' " (*Mendoza, supra,* 88 Cal.App.5th at p. 299.) Accordingly, we cannot conclude that the trial court's determination that dismissal would endanger public safety was "so irrational or arbitrary that no reasonable person could agree with it." (*Carmony, supra*, 33 Cal.4th at p. 377.)

Again, we find no abuse of discretion in the trial court's denial to the motion to strike.

### C. *Ineffective Assistance of Counsel*

Atayde claims that he received ineffective assistance of counsel due to his counsel's failure to object to a number of restitution fines and fees. Atayde argues that

23

pursuant to *People v. Dueñas* (2019) 30 Cal.App.5th 1157, 1164 (*Dueñas*)[10], the trial court was required to evaluate his ability to pay these fines and fees. As his counsel did not object to the imposed fines and fees based on Atayde's inability to pay, which would have been to Atayde's benefit, Atayde contends he was prejudiced by his counsel's deficient performance.

At the sentencing hearing, the trial court ordered Atayde to pay the following fines and fees: (1) a restitution fine of $10,000 (§1202.4, subd. (b)(2)); (2) an $80 court assessment fee (§ 1465.8, subd. (a)(1)); and (3) a $60 court facilities assessment (Gov. Code, § 70373.) In making this order, the court noted that Atayde was youthful and would have some opportunity to have an income source, either through a job or having his money put "on the [] books," once transferred to the Department of Corrections. The court indicated that a portion of those funds would be attributable towards restitution fines and fees. Atayde's counsel did not object to any of the fines and fees or indicate that Atayde lacked the ability to pay.

To prevail on a claim of ineffective assistance of counsel, a criminal defendant must establish both that his or her counsel's performance was deficient and that he or she suffered prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687.) The deficient performance component of an ineffective assistance of counsel claim requires a showing

<hr>

[10] We acknowledge that the Courts of Appeal have conflicting opinions on whether *Dueñas* was decided correctly and that the issue is currently before the California Supreme Court. (See *People v. Kopp* (2019) 38 Cal.App.5th 47, 95, review granted Nov. 13, 2019, S257844 [agreeing with *Dueñas* that due process requires an ability-to-pay determination before imposition of court operations or court facilities assessments]; *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1068 (*Aviles*) [concluding that *Dueñas* was wrongly decided and its "analysis is 'fundamentally flawed in that general "fairness" grounds of due process and/or equal protection principles do not afford a defendant a preassessment ability-to-pay hearing before a trial court imposes fines and fees on him or her' "]; *People v. Hicks* (2019) 40 Cal.App.5th 320, 325, review granted Nov. 26, 2019, S258946; *People v. Petri* (2020) 45 Cal.App.5th 82, 90 [finding that *Dueñas* was not "persuasive"].) However, this conflict does not affect our analysis and decision herein.

that "counsel's representation fell below an objective standard of reasonableness" under prevailing professional norms. (*Id*. at p. 688.) Regarding prejudice, a "defendant must show that there is a reasonable probability"—meaning "a probability sufficient to undermine confidence in the outcome"—"that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Id*. at p. 694.)

Generally, "a defense counsel's decision whether to object to the imposition of fines and fees can encompass factors beyond a defendant's financial circumstances, especially in serious cases involving potentially long prison sentences." (*People v. Acosta* (2018) 28 Cal.App.5th 701, 707 (*Acosta*).) "We cannot speculate, given the absence of information before us, what led to defense counsel's decision not to object, but a myopic focus on [the defendant's] financial circumstances that neglects any of the other factors at play in a sentencing hearing may not provide an accurate picture of counsel's strategic calculus." (*Ibid*.)

The record does not demonstrate why Atayde's defense counsel did not object to the fines and assessments or request a hearing on Atayde's ability to pay. Accordingly, we cannot say there could be no satisfactory explanation for defense counsel's inaction regarding the fines and assessments. Further, given the court's statements regarding Atayde's young age and opportunity to earn wages in prison, counsel could have reasonably considered Atayde's ability to earn wages in prison as a reason for not objecting or requesting an ability-to-pay hearing. (See *Aviles, supra,* 39 Cal.App.5th at pp. 1062, 1076-1077 [concluding that a defendant sentenced to a prison term of 82 years to life had the ability to pay $10,600 in restitution fines, $160 in court operations assessments, and $120 in court facilities assessments from either prison wages or monetary gifts from family and friends during his substantial prison sentence.]) "Prison wages range from $12 to $56 per month, depending on the prisoner's skill level. [Citations.] The state may garnish between 20 and 50 percent of those wages to pay the section 1202.4, subdivision (b) restitution fine. [Citations.]" (*Id.* at p. 1076.) Although

25

we recognize that Atayde may have to work for many years in prison in order to pay off the amount imposed, he was only 22 years old at the time of sentencing and had no reported physical disabilities or health conditions that would prevent him from working for the duration of his lengthy sentence.

Further, even if we assumed that Atayde's counsel performed deficiently by failing to object or request an ability-to-pay hearing, Atayde has not met his burden demonstrating that prejudice resulted from his counsel's alleged deficient performance. As discussed above, the facts in the record do not demonstrate definitively that Atayde will be unable to pay the total amount of $10,140 or that the amount imposed is excessive. Thus, we cannot conclude that there is a reasonable probability the result of Atayde's sentencing would have been more favorable to him, namely, that the trial court would have either reduced or not imposed the fines and assessments if Atayde's defense counsel had objected and requested a hearing. (See *People v. Lopez* ((2008) 42 Cal.4th 960, 966 [ineffective assistance of counsel claim requires a showing of prejudice]; see also *Acosta, supra*, 28 Cal.App.5th at p. 708.)

### III.    DISPOSITION

The judgment is affirmed.

_____
Wilson, J.


WE CONCUR:




_____
Bamattre-Manoukian, P.J.




_____
Danner, J.




*People v. Atayde*
H050104